## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TIFFANY LEWIS**,<br><br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>**DENIS R. MCDONOUGH, SECRETARY OF THE DEPARTMENT OF VETERANS AFFAIRS**,<br><br>　　　　　　Defendant. | Case No. 1:21-cv-2831 (TNM) |

## <u>MEMORANDUM OPINION</u>

Tiffany Lewis alleges a hiring manager at the Department of Veterans Affairs did not promote her because of her race and sex.  In response, the Secretary of Veterans Affairs contends Lewis failed to timely exhaust her administrative remedies.  And in any event, he says, the promotion decision came down to qualifications, not race or sex.  The parties have cross-moved for summary judgment.  Based on their briefing and the relevant law, the Court finds the parties do not genuinely dispute any material issues of fact.  And the Court concludes Lewis failed to timely exhaust her administrative remedies or show that the Secretary's nondiscriminatory rationale is pretext for unlawful discrimination.  Because the Secretary is entitled to judgment as a matter of law, the Court will grant the Secretary's motion and deny Lewis's motion.

### I.

Lewis is a Management and Program Analyst in the Department's Office of Logistics and Supply Chain Management Services.  Pl's Counter-Statement of Undisputed Mat'l Facts (PSMF) ¶ 3.  She is a black woman. *Id.* ¶ 1.  And she has held her current GS-14 position since 2014. *Id.* ¶ 3.  In early July 2018, the Department advertised an opening for a Supervisory Management

and Program Analyst position, which paid at a GS-15 rate. *Id.* ¶ 16.  This higher-ranking position entailed "overseeing logistics policy across the VA."  Def.'s Statement of Undisputed Mat'l Fact (DSMF) ¶ 3.  According to the job posting, the position required someone with "experience in supervision" such as "directing work of subordinates, performance management, disciplinary actions, and interview and selection process." *Id.* ¶ 4.  The selectee would be responsible for leading a team of 20 employees. *Id.* ¶ 5.

Lewis applied for the supervisory position the day it was announced.  PSMF ¶ 22.  Her first-line supervisor, Barry Brinker, served as the hiring manager for the job. *Id.* ¶ 18.  Brinker began the hiring process by asking Department employees Robert Wilson and William Eytel to screen resumes. *Id.* ¶¶ 27–28.  They then "review[ed] the eligible applicants' resumes and score[d] them against the attributes in the job description using a scoresheet."  DSMF ¶ 7.  The pair conducted their reviews separately, ranking each candidate against five metrics on a 1-to-5 scale. *Id.* ¶ 8.

Eytel gave Lewis a score of 24 out of 25—higher than any other candidate.  PSMF ¶ 40.  Wilson, however, rated Lewis a bit lower.  He initially scored her a 22. *Id.* ¶ 31.  Then Wilson reviewed Lewis's resume a second time because she had applied for a similar position in another office.  Def.'s Reply in Supp. of Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. (Def.'s Reply & Opp'n) at 12–13,[1] ECF No. 28.   On this second review, Wilson lowered Lewis's score to a 21 because "he noticed that [her] resume did not provide examples to substantiate the experience that she claimed to have."  DSMF ¶ 14.  Wilson similarly reviewed Reginald Wright's resume a second time and reduced his score from a 23 to a 21.  PSMF ¶ 36.  Wright is a black man. *Id.* ¶ 35.

---

[1] The page references in this Opinion refer to the pagination generated by CM/ECF.

Wilson testified that he knew no applicant's race during his review.  Def.'s Reply & Opp'n Ex. 14, at 47:19–21, 49:4–7 (Wilson Dep.), ECF No. 28-2.  He said he never recalled seeing Lewis.  *Id.* at 44:2–8.  But Lewis disputes his recollection.  She claims they met each other at work events, where he would have undoubtedly noticed her race and sex.  Pl.'s Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. (Pl.'s X-MSJ) Ex. 58, at 25:11–26:8 (Lewis Dep.), ECF No. 30-1.  That said, Lewis does not dispute the Secretary's assertion that Wilson lacked knowledge of *Wright's* race.  *Compare* Def.'s Reply & Opp'n at 13 ("Wilson could not have sought to disadvantage Black applicants because when he reviewed the resumes, Wilson did not know *any* of the applicant's races, including Plaintiff's race." (emphasis added)), *with* Pl.'s Reply in Supp. Mot. for Summ. J. (Pl.'s Reply) at 17, ECF No. 30 (stating Wilson only met *Lewis* "in person at town hall events").

In any event, Eytel and Wilson sent their scores to Brinker.  Then he added the scores together in a separate spreadsheet intending to interview the two top-scoring candidates.  DSMF ¶¶ 8, 10.  But there's a wrinkle.  Lewis's score should have added up to 45, tying her with Nathan Turnipseed for second place.  Yet Brinker's spreadsheet showed only 44 for Lewis, putting her in third place behind Dr. Ernest Reed (48) and Nathan Turnipseed (45).  According to Brinker's erroneous tally, the scores looked like this:

| RESUME SCORES | Eytel | Wilson | Brinker (Combined) |
|---|---|---|---|
| *Dr. Ernest Reed* | 23 | 25 | **48** |
| *Nathan Turnipseed* | 23 | 22 | **45** |
| *Tiffany Lewis* | 24 | 21 | ***44*** |

*See* Def.'s Mot. for Summ. J. (Def.'s MSJ) Exs. 5 & 6 (Resume Scoring Spreadsheets), ECF No. 24-3.

So Brinker only interviewed Reed and Turnipseed, the two top-scoring candidates according to his spreadsheet.  Or at least the Secretary claims these interviews occurred.  DSMF

¶ 10.  Lewis argues these interviews never happened.  She points to Reed's deposition testimony where he said Brinker never conducted a formal interview for the position.  PSMF ¶¶ 50–51.  And she emphasizes that Brinker's "interview notes" for Turnipseed bear a date-stamp that *precedes* Brinker's receipt of Eytel's scoresheet—a curiosity the Secretary leaves unanswered.  *See* Pl.'s Reply at 13.

At the end of this puzzling interview process, Brinker hired Reed (a white man) for the supervisory position.  DSMF ¶ 12.  Lewis learned of Brinker's selection on August 15, 2018, when Brinker announced Reed's promotion at a staff meeting.  *Id.* ¶ 18.  At the time, Lewis believed that Brinker "had simply selected the most qualified candidate."  PSMF ¶ 58.

Unbeknownst to Lewis, however, the Department received an anonymous letter that month stating that "nepotism" existed in the Office of Logistics and Supply Chain Management.  *Id.* ¶ 61.  So the Department instructed its third-party human resources provider, VHA Service Center (VSC), to conduct an informal investigation into the letter's allegations.  *See* Pl.'s X-MSJ Ex. 28 (VSC Invest. Mem.).

VSC telephonically interviewed Brinker during its investigation.  When asked why he lowered Lewis's score, Brinker said he "review[ed] the scores and ma[de] a tie breaker determination because he only wanted to interview the top 2 candidates."  *Id.* at 4.  But after this conversation, Brinker "went back and reviewed the excel sheets . . . to refresh [his] memory." *Id.*  With his recollection refreshed, Brinker emailed the investigators this explanation:

> Because of some of the formatting issues of 3 sheets and 2 panel members, (I attempted to delete a sheet and it removed the formula) I keyboarded each of the scores into a central sheet.  If there was a discrepancy by my *keyboarding error* (as you mentioned on the call) with Tiffany Lewis for the individual sheet (for 1 point) it did not affect the overall composite score.  Tiffany Lewis would still not have been in the top 2.

> I recall mentioning to the panel members that I would *break the tie* if there was a tie to get to just 2 interviews per job . . . so I was a bit confused on the phone and the only explanation would have been that I broke the tie myself.

*Id.* (emphasis added).  In short, Brinker's explanation for Lewis's docked score vacillated between sheer accident (a keyboarding error) and deliberate action (breaking the tie).  The parties dispute the true motivation behind Brinker's math.  *Compare* DSMF ¶ 11, *with* PSMF ¶ 65.  VSC, however, found "no evidence" substantiating the allegation that Brinker "abused his authority by pre-selecting and hiring close friends in high positions, without a selection panel and interview process."  VSC Invest. Mem. at 3, 5.

A month after VSC concluded its investigation, Brian O'Connor (the Director of Business Services for the Office of Acquisitions and Logistics) filed a whistleblower complaint against Brinker.  PSMF ¶ 66.  The complaint accused Brinker of manipulating the scores "such that one highly qualified applicant (black, female) fell below the cut-off line he set for who he would interview."  Pl.'s X-MSJ Ex. 29, at 2 (Whistleblower Compl.).  It also alleged that Brinker "had predetermined who he would select" because it was "well-known" that Brinker and Reed were friends.  *Id.*

Lewis lacked contemporaneous knowledge of VSC's investigation or O'Connor's whistleblower complaint.  PSMF ¶¶ 67–68.  She claims she first suspected unlawful conduct affected her non-selection in December 2018.  *Id.* ¶ 78.  The day after Christmas, Lewis met with Reed (who had become her first-line supervisor, *id.* ¶ 59) and Thomas Burgess (her third-line supervisor, *id.* ¶ 71) to discuss a detail opportunity Lewis requested and Reed denied.  *Id.* ¶¶ 69–71.  During the meeting, Burgess rhetorically asked Lewis whether Brinker and Reed thought "we were living in the 1950s or something."  *Id.* ¶ 76.  Lewis interpreted this comment as "a

reference to the Jim Crow era," *id.* ¶ 77, and "began to suspect that her non-selection for [the supervisory position] was due to her status as a Black woman," *id.* ¶ 78.

So in early January, Lewis submitted a FOIA request to the Department requesting all documentation related to her application for the supervisory position. *Id.* ¶ 79.  And on January 23, she contacted an EEO Counselor for the first time. *Id.* ¶ 81; *see also* DSMF ¶ 18.  In April, the Department's Office of Whistleblower Protection tried to interview Brinker about Lewis's non-selection.  But he resigned the day of his scheduled interview.  PSMF ¶ 87.

Lewis sued the Secretary in October 2021.  Compl., ECF No. 1.  Her Complaint contains a single claim:  non-selection discrimination on the basis of race and sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Id.* at 9.  The Secretary moved to dismiss the Complaint on exhaustion grounds.  Def.'s Mot. to Dismiss, ECF No. 8.  But the Court denied his motion.  Order, ECF No. 12.  The Secretary and Lewis have cross-moved for summary judgment.  Def.'s MSJ; Pl.'s X-MSJ.  Those motions are now ripe, and the Court has jurisdiction to adjudicate them.  *See* 28 U.S.C. § 1331.  For the reasons stated below, the Court will grant the Secretary's motion and deny Lewis's motion.

## II.

A party may move for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To establish a fact as undisputed, a party may rely on "materials in the record, including depositions, documents, . . . affidavits or declarations."  *Id.* 56(c)(1)(A).  A fact is "material" for purposes of summary judgment if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Hayes*

*v. District of Columbia*, 923 F. Supp. 2d 44, 48 (D.D.C. 2013).  Once the movant carries its

burden, the non-moving party must provide "specific facts showing that there is a genuine issue

for trial."  *Anderson*, 477 U.S. at 250.

## III.

Lewis's Complaint presents one claim:  race and sex discrimination, in violation of Title

VII.  *See* Compl. at 9.  The Secretary argues he should win on summary judgment for two

independent reasons.  First, he argues Lewis did not timely exhaust her administrative remedies

because she failed to "initiate contact with a[n EEO] Counselor . . . within 45 days of the

effective date of the [personnel] action."  29 C.F.R. § 1614.105(a)(1).  Alternatively, he argues

the Department had legitimate, nondiscriminatory reasons for hiring Reed over Lewis.

Lewis resists both arguments.  In her view, the 45-day exhaustion clock started when she

"reasonably suspect[ed]" that she may have been a victim of discrimination.  Pl.'s X-MSJ at 14.

And she argues the Secretary's asserted nondiscriminatory rationale is just pretext for

discrimination.  To Lewis, this case is so clear-cut that no reasonable jury could find for the

Secretary.  The Court evaluates the parties' exhaustion and merits arguments below.  And it

concludes the Secretary has the upper hand on both issues.

## A.

Begin with exhaustion.  Before a federal employee can sue her employer for

discrimination in violation of Title VII, she "must first exhaust [her] administrative remedies."

*Green v. Brennan*, 578 U.S. 547, 552 (2016).  To exhaust those remedies, the employee must

comply with the Equal Employment Opportunity Commission's regulation on pre-complaint

processing.  *Id.*  And that regulation requires any aggrieved employee to contact "a Counselor

within 45 days of the date of the matter alleged to be discriminatory, or in the case of a personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).

This case concerns a personnel action—Lewis's non-selection.  *See* Pl.'s X-MSJ at 24 n.1.  So to satisfy the exhaustion rule, Lewis had to contact an EEO Counselor "within 45 days of the effective date of that action."  § 1614.105(a)(1).  She did not do this.  Indeed, the parties agree that August 15, 2018, marked the "effective date" of her non-selection.  DSMF ¶ 18.  On that day, "Brinker announced that he had selected Earnest Reed for the Supervisory Management and Program Analyst position."  PSMF ¶ 57.  This meant Lewis had until October 1 to contact an EEO Counselor.  *See Vasser v. McDonald*, 228 F. Supp. 3d 1, 13 (D.D.C. 2016) ("[T]he administrative timeline in the case of a personnel action begins on 'the effective date of the action.'" (quoting § 1614.105(a)(1))).  Yet the undisputed evidence shows Lewis waited until the following January to make that contact.  PSMF ¶ 81; DSMF ¶ 19.  So she missed the 45-day exhaustion window by months.

But Lewis argues an exception applies that extends the exhaustion window.  As she points out, the 45-day limit "shall [be] extend[ed]" "when the individual shows . . . that he or she *did not know and reasonably should not have* been [sic] *known* that the discriminatory matter or personnel action occurred."[2]  § 1614.105(a)(2) (emphasis added).  Call this the "knowledge-based tolling provision."  And Lewis's non-selection is a "personnel action," not a "discriminatory matter."  *See* Pl.'s X-MSJ at 24 n.1 ("[N]on-selection is a discrete personnel

---

[2] The word "been" in this quotation is likely a scrivener's error, and the regulation is best read without it.  *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 234 (2012) ("No one would contend that [a] mistake cannot be corrected if it is of the sort sometimes described as a 'scrivener's error.'" (citation omitted)).  The D.C. Circuit has done this twice.  *See Drielak v. Pruitt*, 890 F.3d 297, 299 (D.C. Cir. 2018) ("that he or she did not know and reasonably should not have [ ] known that the discriminatory matter or personnel action occurred" (citation omitted)); *Stewart v. Ashcroft*, 352 F.3d 422, 425 (D.C. Cir. 2003) (same).

action."); *cf. Green*, 578 U.S. at 553 n.5 ("Green does not contend that his alleged constructive discharge is a 'personnel action.'  We therefore address the 'matter alleged to be discriminatory' clause only."  (cleaned up)).

Whittled down, the knowledge-based tolling provision only protects Lewis if "she did not know and reasonable should not have . . . known that the . . . *personnel action occurred*." § 1614.105(a)(2) (emphasis added).  But the Secretary has produced undisputed evidence that Lewis knew Reed got the promotion, not her.  DSMF ¶ 18; PSMF ¶¶ 12, 57.  And Lewis concedes she knew this information on August 15, 2018—161 days before she contacted a Counselor.  DSMF ¶ 18; PSMF ¶ 57; *see also* Def.'s MSJ Ex. 7, at 38:15–24 (Lewis Dep.).  Because Lewis possessed actual knowledge that her "personnel action occurred," § 1614.105(a)(2), the knowledge-based tolling provision cannot help her.

The D.C. Circuit's decision in *Stewart v. Ashcroft* supports this conclusion.  *See* 352 F.3d 422, 425–26 (D.C. Cir. 2003).  *Stewart* involved a plaintiff who, like Lewis, argued he was entitled to tolling because he "did not know and reasonably should not have known [ ] that the discriminatory matter or personnel action occurred." *Id.* at 425 (quoting § 1614.105(a)(2)).  But the court rejected Stewart's argument because circumstantial evidence proved he knew another candidate had been selected for the position, yet he waited more than 45 days to contact a Counselor.  *See id.* at 425–26.  Note the circuit's focus on Stewart's knowledge of his colleague's promotion, not on his suspicions of discriminatory motives.  *See id.*

This case is more straightforward than *Stewart*.  Unlike Stewart, Lewis *concedes* she had actual knowledge of Reed's selection on August 15.  PSMF ¶¶ 57–58; DSMF ¶ 18.  And she *concedes* she waited until the following January to contact an EEO Counselor.  PSMF ¶ 81; DSMF ¶ 18.  These concessions are fatal under *Stewart*.

They also prove fatal under *Miller v. Hersman*, 594 F.3d 8, 11–12 (D.C. Cir. 2010).  In that case, the Government argued against knowledge-based tolling because the plaintiff learned "that *he* had not been selected for the Budget Officer position" more than 45 days prior to his first EEO contact.  *Id.* at 11.  Yet the Government lost because it "cited no evidence demonstrating that [the plaintiff] knew the identity of the selectee—or her gender—" on the date he learned of his non-selection.  *Id.* at 12.

Not so here.  When Lewis learned of her non-selection in August 2018, she *also* learned Brinker selected Reed.  DSMF ¶ 18; PSMF ¶ 57.  And she knew then that he was a white man.  PSMF ¶¶ 12, 57–58.  To borrow from *Miller*, these undisputed facts prove Lewis "knew or reasonably should have known of the alleged discrimination" in August 2018.  594 F.3d at 12.  Yet she waited until January 2019 to contact a Counselor.  PSMF ¶ 81.  So she cannot seek refuge from the knowledge-based tolling provision.

This result sits comfortably with the approach taken by most other circuits.  Appellate courts typically focus on actions over motives when applying the knowledge-based tolling provision.  *See, e.g.*, *Hickey v. Brennan*, 969 F.3d 1113, 1124 (10th Cir. 2020) (knowledge-based tolling unavailable because "Hickey was fully aware of her termination" but failed to contact a counselor within 45 days); *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (tolling available because "Shiver contacted an EEO counselor within 45 days of . . . the date that he learned that his demotion had become effective"); *Jakubiak v. Perry*, 101 F.3d 23, 27 (4th Cir. 1996) (tolling unavailable because "Jakubiak did not . . . initiate counseling" within 45 days of when another candidate was "officially installed . . . as Deputy Director");[3] *but see Johnson v.*

---

[3] Counting unpublished decisions, the tally grows by at least three circuits.  *See, e.g.*, *Winder v. Postmaster Gen. of the U.S.*, 528 F. App'x 253, 255 (3d Cir. 2013) (starting the 45-day limitations period on the non-selection date because "a claim accrues in a federal cause of action

*Runyon*, 47 F.3d 911, 920 (7th Cir. 1995) ("The time limit [in the exhaustion rule] is extended until facts that would support a charge of discrimination were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff." (cleaned up)).

Against all this, Lewis advances a different perspective on the knowledge-based tolling provision. In her view, that provision requires the Court to apply a "reasonable suspicion" standard. The standard appears with some frequency in this district, although the D.C. Circuit has "never decided whether [it] accurately states current law." *Drielak v. Pruitt*, 890 F.3d 297, 299 n.2 (D.C. Cir. 2018). Under this standard, "[t]he plaintiff's time for filing an EEOC charge starts to run when the plaintiff has a *reasonable suspicion* that [s]he has been the victim of discrimination." *Johnson v. Gonzales*, 479 F. Supp. 2d 55, 59 (D.D.C. 2007) (emphasis added); *see also, e.g.*, *Armstead v. Jewell*, 958 F. Supp. 2d 242, 245–46 (D.D.C. 2013) ("Under [§ 1614.105(a)(2)], 'the 45-day clock is tolled until the aggrieved employee has a "reasonable suspicion" that [s]he has been the victim of discrimination.'" (quoting *Saunders v. Mills*, 842 F. Supp. 2d 284, 291 (D.D.C. 2012))). Slightly rephrased, the exhaustion clock starts under the reasonable suspicion standard when an employee reasonably suspects a discriminatory *motive*, not when she learns of the discriminatory *act*.

---

upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong" (cleaned up)); *Rivers v. Geithner*, 548 F. App'x 1013, 1017 (5th Cir. 2013) (per curiam) ("Rivers asserts that the limitations period should not have begun the day of her resignation, but rather when she had a reasonable suspicion that her termination was based on discrimination. This Circuit's precedent clearly establishes, however, that 'in Title VII cases [] the limitations period starts running when the plaintiff knows of the discriminatory *act*, not when the plaintiff perceives a discriminatory motive behind the act.'" (cleaned up)); *Ho v. Brennan*, 721 F. App'x 678, 681 (9th Cir. 2018) (mem. disposition) (holding the exhaustion period "extends to the point in time when an employee knows or should have known of the comparators' disparate treatment").

Despite its prevalence in this district, the reasonable suspicion standard is incompatible with the exhaustion regulation's text or history.

Look again at the text of the knowledge-based tolling provision.  It says the 45-day limit "shall [be] extend[ed]" "when the individual shows . . . that he or she *did not know and reasonably should not have . . . known* that the . . . personnel action occurred."  § 1614.105(a)(2) (emphasis added).  So at least in cases involving personnel actions, the regulation asks whether an employee reasonably knows about the "personnel action," not whether she reasonably suspects discrimination motivated that action.  *Id.*  This proviso then protects plaintiffs who were reasonably unaware of something like a rival's stealth promotion.

The "discriminatory matter" clause in the knowledge-based tolling provision does not alter this inquiry.  The exhaustion rule "expressly distinguishes cases involving personnel actions from other cases involving allegations of discrimination."  *Jakubiak*, 101 F.3d at 26; *see also Green*, 578 U.S. at 553 n.5 (distinguishing between the clauses).  Recall its exact language:  "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory *or*, in the case of a personnel action, within 45 days of the effective date of the action."  § 1614.105(a)(1) (emphasis added).

Now parse its grammar:  The first relevant noun ("matter") is followed by a modifier ("alleged to be discriminatory") that does not apply to the second relevant noun ("personnel action").  *See* Scalia & Garner, *supra* at 149 (giving "[a] partnership registered in Delaware or a corporation" as an example of a "postpositive modifier [that] does not apply to each item").  So later when the knowledge-based tolling provision refers to "personnel action," the disjunct "discriminatory matter" does not color its meaning.  *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the

words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (cleaned up)).

History illuminates the mismatch between the exhaustion regulation's text and the reasonable suspicion standard. The reasonable suspicion standard came first. It debuted in this district in 1982. *See Parades v. Nagle*, No. 81-1374, 1982 WL 319, at \*4 (D.D.C. Jan. 17, 1982) ("This 'reasonable suspicion' standard . . . appears to be the best triggering standard for [exhaustion]."). But the 1982 version of the regulation explicitly yoked exhaustion's trigger to the employee's "belie[f that] he had been discriminated against." 29 C.F.R. § 1613.214(a)(1)(i) (1979). Note, however, that this held true only for discriminatory matters, not personnel actions. The regulation still referred to these events as distinct incidents. *See id.* ("The agency may accept the complaint for processing in accordance with this subpart only if—(i) The complainant brought to the attention of the Equal Employment Opportunity Counselor the matter causing him to believe he had been discriminated against within 30 calendar days of the date of that matter, or, if a personnel action, within 30 calendar days of its effective date[.]"). But this did not seem to make a difference to the early adopters of the reasonable suspicion standard, who appear to have conflated the two. *See Parades*, 1982 WL 319, at \*2 (discussing the importance of an employee's "belie[f]" in discrimination in the context of a personnel action).

Triggering events aside, if an employee sought an extension because she lacked knowledge of the discriminatory matter or personnel action, she would have been out of luck. Back then, the regulation contained no knowledge-based tolling provision. *Compare* 29 C.F.R. § 1613.214(a)(4) (1979) (tolling allowed only for lack-of-notice, external circumstances, or "other reasons considered sufficient"), *with* 29 C.F.R. § 1614.105(a)(2) (2010) (tolling allowed

for same reasons, plus when the employee "did not know and reasonably should not have

. . . known that the discriminatory matter or personnel action occurred").[4]

Enter the reasonable suspicion standard.  The rationale in *Parades* came straight from the

regulation's emphasis on an employee's belief in discrimination.  *See Parades*, 1982 WL 319, at

*2 ("The heart of plaintiff's argument is derived from the . . . portion of the governing regulation

which indicates that the 30-day time period begins to run once something has caused the putative

plaintiff to believe that he has been the victim of discrimination.").  And the new standard filled

a gap left by the regulation.  It shielded employees from exhaustion's bite when they lacked

knowledge—or at least a reasonable suspicion—of the relevant triggering event.  *See id.* at *4.

But the EEOC eventually displaced these judicial pronouncements.  In 1992, it adopted

the current 45-day limit through notice-and-comment rulemaking pursuant to a statutory grant of

authority in Title VII.  *See* Federal Sector Equal Employment Opportunity, 57 Fed. Reg. 12634,

12634–35, 12648 (1992); 42 U.S.C. § 2000e-16(b) (authorizing EEOC rulemaking).  This new

rule obviated the two factors grounding the reasonable suspicion standard.  The exhaustion

---

[4] In full, the historic version states:

> (4) The agency shall extend the time limits in this section: (i) When the complainant shows that he was not notified of the time limits and was not otherwise aware of them, or that he was prevented by circumstances beyond his control from submitting the matter within the time limits; or (ii) for other reasons considered sufficient by the agency.

29 C.F.R. § 1613.214(a)(4) (1979).  And the current version states:

> (2) The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, *that he or she did not know and reasonably should not have* been [sic] *known that the discriminatory matter or personnel action occurred*, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2) (2010) (emphasis added).

window now began on "the *date* of the matter alleged to be discriminatory" or "the effective *date* of the [personnel] action."  29 C.F.R. § 1614.105(a)(1) (2010); *see also* 57 Fed. Reg. at 12648. This new focus on knowable dates minimized the relevance of an employee's "belie[f that] he had been discriminated against," at least in relation to *starting* the exhaustion period.  29 C.F.R. § 1613.214(a)(1)(i) (1979).

And in terms of *extending* that period, the new regulation added a knowledge-based justification for tolling.  Now when an employee shows that "she did not know and reasonably should not have . . . known that the discriminatory matter or personnel action occurred," the 45-day limit "shall [be] extend[ed]."  29 C.F.R. § 1614.105(a)(2) (2010).  But notice how tolling still turns on reasonable knowledge of the event itself, not on reasonable suspicion of the motives behind the event.  Given this backstory, it appears the reasonable suspicion standard is an anachronism built to service a regulation that has since changed.

Lewis retreats to policy arguments to revivify the reasonable suspicion standard.  *See, e.g.*, Pl.'s Reply at 5 (claiming a bright-line rule focused on actions over motives would "encourage[e] frivolous lawsuits").  And her arguments make some sense.  But there is also merit to a system that promotes finality and quick adjudication of discriminatory conduct.  *See* 57 Fed. Reg. at 12635 (justifying 45-day period because "the earliest possible contact with a counselor aids resolution of disputes because positions on both sides have not yet hardened"). Regardless, Congress empowered the EEOC to "issue such rules [and] regulations . . . it deems necessary and appropriate to carry out its responsibilities."  42 U.S.C. § 2000e-16(b).  And after weighing the pros and cons of various time limits for pre-complaint processing, it settled on a 45-day limit triggered by readily ascertainable dates.  *See* 57 Fed. Reg. at 12634–35, 12648.  It is not up to courts to reweigh those policy considerations.

Even if the Court applied the reasonable suspicion standard, Lewis would lose. She claims she first suspected discrimination when Burgess made his "1950s" comment in a meeting with her and Reed. PSMF ¶ 78. But the meeting focused on *Reed*'s denial of a detail opportunity for Lewis, not *Brinker*'s selection of Reed over Lewis. *Id.* ¶¶ 69–71. Granted, Burgess apparently made his comment in the context of discussing Lewis's non-selection. *Id.* ¶¶ 75–76. But "courts in this circuit have routinely held that an employee reasonably should suspect that there might be discriminatory reasons for his or her non-selection (or non-promotion) upon learning that an individual of a different race (or gender, if applicable) was selected (or promoted)." *Armstead*, 958 F. Supp. 2d at 246 (cleaned up) (collecting cases). In other words, Lewis should have *initially* suspected discrimination when she learned of Reed's selection in August, PSMF ¶ 57, not during her meeting with Burgess in December. *Cf. Drielak*, 890 F.3d at 299 (holding Drielak's conversation with colleague "could [not] possibly excuse [his] noncompliance with the 45-day period" because "he had already complained about discrimination" outside the exhaustion window).

Undeterred, Lewis has one more backup argument: equitable tolling. Lewis correctly recognizes that equity offers "an independent basis for tolling," apart from § 1614.105(a)(2). *Harris v. Gonzalez*, 488 F.3d 442, 444 (D.C. Cir. 2007). But equitable tolling is hard to get. *See id.* To gain its protection, Lewis must show that she diligently pursued her rights, but "some extraordinary circumstance stood in her way and prevented timely filing." *Dyson v. District of Columbia*, 710 F.3d 415, 421 (D.C. Cir. 2013) (cleaned up). This occurs, for instance, when a plaintiff "has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Dep't of Vets. Affs.*, 498 U.S. 89, 96 (1990).

Here, Lewis suggests the Department's passive concealment of the selection process
lulled her into sitting on her rights.  *See* Pl.'s X-MSJ at 27–29.  But Lewis has identified no
authority requiring the Department to immediately disclose the selection process's innerworkings
to unsuccessful applicants.  *See* Def.'s Reply & Opp'n at 7.  So when the Department kept this
information from Lewis—and every other applicant—it did nothing wrong.  Certainly nothing
wrong enough to warrant equitable tolling.

*      *      *

Having considered the exhaustion regulation's text and history, as well as controlling
precedent, the Court concludes that Lewis failed to timely exhaust her administrative remedies.
This alone entitles the Secretary to summary judgment.

**B.**

Lewis's non-selection claim fares no better on the merits.  Title VII makes it unlawful for
an employer to "discriminate against any individual with respect to" hiring, firing, or the "terms,
conditions, or privileges of employment, because of such individual's race, color, religion, sex,
or national origin."  42 U.S.C. § 2000e-2(a)(1).  For federal employees, the ban on
discrimination extends to "[a]ll personnel actions affecting employees."  *Id.* § 2000e-16(a).

Lewis claims the Department engaged in race and sex discrimination during the
promotion process.  *See* Compl. ¶¶ 54–55.  To prevail under her disparate treatment theory of
liability, Lewis must "prove that [her] employer intentionally treat[ed her] less favorably than
others because of [her] race [or] sex."  *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir.
2019) (cleaned up).  "[A]t all times," Lewis bears the burden of proving that the Department
"intentionally discriminated against her."  *Id.* (cleaned up).

17

Lewis argues the *McDonnell Douglas* framework reveals the Department's discriminatory intent.  The framework's three steps are familiar.  First, Lewis must establish a prima facie case of race or sex discrimination.  *See id.*  If she succeeds, then "the burden shifts to the [Department] to articulate a legitimate, nondiscriminatory reason for its action."  *Id.* (cleaned up).  And if the Department "meets its burden of production, the 'burden then shifts back' to [Lewis], who must prove that, despite the proffered reason, she has been the victim of intentional discrimination."  *Id.* (cleaned up).

The Department has asserted a legitimate, nondiscriminatory reason for promoting Reed instead of Lewis.  It says Reed was the best qualified candidate; race and sex had nothing to do with the decision.  *See* Def.'s MSJ at 11.  So rather than evaluating Lewis's prima facie case, the Court skips straight to "the central issue:  whether [Lewis] produced evidence sufficient for a reasonable jury to find that the [Department's] stated reason was not the actual reason and that the [Department] intentionally discriminated against [Lewis] based on [her] race" and sex. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *see also Figueroa*, 923 F.3d at 1087 ("When the employer properly presents a legitimate, nondiscriminatory reason, the District Court 'need not—*and should not*—decide whether the plaintiff actually made out a prima facie case' because it better spends its limited resources on assessing the third prong." (quoting *Brady*, 520 F.3d at 494)).

Tackling this inquiry requires a closer look at two issues: (1) whether the Department's asserted nondiscriminatory motivations constitute an "adequate evidentiary proffer"; and (2) whether those motivations amount to pretext for unlawful discrimination.  *Figueroa*, 923 F.3d at 1087 (cleaned up).  The Court evaluates each issue below.

**1.**

First up, nondiscriminatory motivations.  The Department tries to fend off Lewis's

discrimination allegations by claiming it hired the best candidate—Reed.  The parties agree that

the supervisory position required someone with "experience in supervision," including tasks like

"directing work of subordinates, performance management, disciplinary actions, and interview

and selection process."  DSMF ¶ 4.  And the Department argues that Reed's experience,

technical skills, and education made him the best candidate for the job.

As for experience, Reed spent four years serving as Acting Chief of Business

Transformation for the Department.  *See* Def.'s Reply & Opp'n at 10.  In that role, he

"developed program management activities throughout the [Department], . . . led the

development and maintenance of executive dashboard reporting capabilities, established

overarching priorities, evaluated alternatives when problems arose, oversaw resource

requirements, and assessed programmatic feasibility."  Def.'s MSJ at 14.  His supervisors

selected him "to oversee program management implementation on the VA Secretary's 15 priority

initiatives."  *Id.* And he "served as a program manager for the Veterans Affairs Acquisition

program Management Framework, . . . and . . . as a project manager for the VA's transition to

[the] Federal Acquisition Institute Training Application System, which was completed ahead of

schedule."  *Id.*

Reed also had extensive management experience in the private sector and in the military.

For example, he spent nine years serving "as a senior logistics manager for an 800-person

military police battalion where he planned and managed projects in multiple countries."  *Id.* at

15.  After his time in the service, he held positions such as Executive Director for CHIMES DC,

a private defense contractor.  *Id.* at 14.  Lewis does not dispute Reed's experience, though she

does dispute the Department's assertion that she performed more "frontline work rather than leadership experience."  PSMF ¶ 10; DSMF ¶ 13.

Reed also held several technical certifications that earned him the Department's trust. These certifications include, for example, "a Federal Acquisition Certification and a Senior Level SIX SIGMA Green Belt Certification."  DSMF ¶ 15.  To the Department, these certifications signaled that Reed "had the necessary technical skills to succeed in the position."  *Id.*  Lewis concedes Reed possessed these certifications during the promotion process, and she similarly concedes she "did not hold these certifications."  *Id.*

And Reed's application especially stood out when it came to education.  He held a Bachelors', Masters', and Ph.D. in Business Administration.  *Id.* ¶ 16.  Lewis, on the other hand, "did not have a Ph.D. and earned her Masters' degree in Business Administration just two months before she applied for the Supervisory Position."  *Id.* ¶ 17.  Unsurprisingly then, Lewis does not dispute that Reed "had superior academic credentials."  *Id.* ¶ 16.

Yet Lewis attacks the Department's qualifications-based explanation, saying it falls short of "the requirements for an 'adequate' evidentiary proffer."  *Figueroa*, 923 F.3d at 1087 (cleaned up); *see also* Pl's X-MSJ at 32–39.  Drawing on the "factors" in *Figueroa*,[5] Lewis offers two

---

[5] *Figueroa* called four factors "paramount in the analysis" of an employer's asserted motivations: (1) whether the evidence is admissible; (2) whether the factfinder, if it believed the evidence, could find the action was motivated by a nondiscriminatory rationale; (3) whether the nondiscriminatory rationale is "legitimate" or "facially 'credible'" in light of the proffered evidence," and (4) whether the evidence presents a "clear and reasonably specific explanation." 923 F.3d at 1087–88.  Lewis only leans on the first and third factors in her arguments.  *See* Pl.'s X-MSJ at 33–39.  So the Court focuses on these factors in its analysis.  More, any challenge under the second and fourth factors would fail in this case.  If the jury believed the Department's qualifications-based explanation, it is entirely reasonable for the jury to believe the Department based its promotion on that rationale.  *See Figueroa*, 923 F.3d at 1087.  And the Department "articulate[s] specific reasons" Reed's qualifications exceeded Lewis's.  *Id.* at 1089 (citation omitted); *see* Def.'s MSJ at 13–15 (explaining Reed's superior qualifications).

reasons to reject the Department's nondiscriminatory explanation. 923 F.3d at 1087–88. Neither persuades.

*First*, an "employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)." *Id.* at 1087. Lewis claims that no admissible evidence supports the Department's explanation. *See* Pl.'s X-MSJ at 33–34. And she specifically questions the Department's reliance on Brinker's unsworn interrogatory responses and Reed's resume. *See id.* "At the summary judgment stage," however, "a party is not required to produce evidence in a form that is admissible." *Ayuda, Inc. v. FTC*, 70 F. Supp. 3d 247, 280 (D.D.C. 2014). The party's evidence must merely "be capable of being converted into admissible evidence at trial." *Id.* Because the Department could convert Brinker's responses and Reed's resume into live testimony at trial, Lewis's evidentiary challenge fails. *See id.*

*Second*, an employer's "nondiscriminatory explanation must be legitimate." *Figueroa*, 923 F.3d at 1089. Or to put a finer point on it, "the reason must be facially 'credible' in light of the proffered evidence." *Id.* (cleaned up). It cannot be "based on an utterly implausible account of the evidence." *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986).

Lewis says the Secretary's explanation is riddled with holes. For example: (1) Brinker told HR representatives that he deliberately lowered Lewis's score to "break the tie" between her and Turnipseed, Pl.'s X-MSJ at 35; (2) an employee in the Department's whistleblower office tested the scoring spreadsheets and found them in working order, supposedly undermining Brinker's keyboarding-error explanation, *id.* at 35–36; (3) Brinker told an EEO Counselor that Lewis had been "screened out by the screening panel," when, in fact, Brinker's own handling of the spreadsheet bumped Lewis off the interview list, *id.* at 36; (4) Brinker resigned the day he was supposed to be interviewed by whistleblower investigators, *id.*; (5) Reed said in his

deposition that he never sat down for "an actual interview" with Brinker, even though the Secretary says Brinker interviewed Reed, *id.* at 37; (6) Brinker dated his "interview notes" for Turnipseed as July 25, 2018, at 10:00 a.m., even though he did not receive Eytel's scoresheet until that afternoon, *id.*; (7) Brinker gave Reed the position description long before the Department publicly announced it, PSMF ¶ 11; and (8) Reed sent Brinker his resume before he applied, and Brinker told him he was "completely on track . . . no worries," *id.* ¶¶ 14–15.

Given these circumstances, Lewis says the Secretary "insufficiently substantiated" his qualifications-based explanation. *Id.* at 39 (quoting *Figueroa*, 923 F.3d at 1087). To be sure, Lewis has diligently exposed cracks in the Secretary's case, particularly as to Brinker's credibility. But query whether these cracks mean the Secretary has based his rationale "on an *utterly implausible* account of the evidence." *Bishopp*, 788 F.2d at 786 (emphasis added). Lewis still concedes Reed possessed superior education and certification credentials. DSMF ¶¶ 15–16. And she does not dispute the fact that Reed held many management positions within the Department and elsewhere, all of which highlighted his leadership skills. She only disputes the Secretary's assertion that Reed had more relevant experiences than herself. PSMF ¶ 10.

But even if Lewis "proves the [Secretary's] asserted reason to be *false*," she must do more to take her case to trial. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Indeed, a reasonable jury must be able to find that the Secretary's asserted motivation was "a pretext *for discrimination*." *Id.* So Lewis must point to some evidence "show[ing] *both* that the [Secretary's] reason was false, *and* that discrimination was the real reason." *Id.*; *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290–91 (D.C. Cir. 1998) (applying *Hicks* in summary judgment context).

**2.**

Lewis cannot prove pretext.  When it comes to discrimination claims, "poof of illicit motive is essential."  *Figueroa*, 923 F.3d at 1086 (cleaned up).  Again, this means an employee alleging discrimination "'at all times' has the burden of proving 'that the defendant intentionally discriminated against' her."  *Id.* (cleaned up).  A discrimination plaintiff cannot "prevail by presenting evidence that tends to show that the employer's proffered reason is pretextual but also 'demonstrates that the real explanation for the employer's behavior is not discrimination, but *some other motivation*.'"  *Hendricks v. Geithner*, 568 F.3d 1008, 1014–15 (D.C. Cir. 2009) (quoting *Aka*, 156 F.3d at 1291) (emphasis added).  So when an employer's asserted rationale turns out to be a cover-up, the employee still must show the rationale covered up something unlawful.

The core allegation here is race and sex discrimination.  Compl. ¶¶ 54–55.  And Lewis claims the Secretary's qualifications-based explanation is a cover-up for this unlawful conduct.  Pl.'s X-MSJ at 39.  She tries to connect the dots to unlawful discrimination in two ways.  Neither withstands scrutiny.

*First*, Lewis tries to tackle the qualification explanation head-on.  She argues she was "significantly more qualified than Dr. Reed" because she had experience in the "medical category."  Pl.'s Reply at 14.  And "medical logistics" comprised a "significant portion" of the work in the office advertising the supervisory position.  *Id.* at 15.  Since Reed lacked comparable medical experience, Lewis views her experience as superior.  *See* Pl.'s X-MSJ at 41.

This argument faces a steep climb.  "[W]hen an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly* better

qualified for the job' than [the applicant] ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). "The qualifications gap must be 'great enough to be inherently indicative of discrimination.'" *Id.* (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)).

Lewis has not shown she was "significantly" more qualified than Reed. *Id.* True, Lewis had experience in one sector that Reed lacked. PSMF ¶ 10. But Reed undisputedly possessed superior academic and technical credentials. DSMF ¶¶ 15–17. And he had an extensive background in logistics and supply chain management. Def.'s MSJ at 14–15. Recall, too, that Reed's resume screening score (48) still outpaced Lewis's correct score (45) by three points. DSMF ¶¶ 9, 11. So no reasonable jury could find that the gap—if any—between Lewis and Reed's qualifications was so "great" that it "inherently indicat[es] . . . discrimination." *Adeyemi*, 525 F.3d at 1227.

*Second*, Lewis tries to prove pretext by claiming the Department also discriminated against a similarly situated applicant, at least as to race. *See* Pl.'s X-MSJ at 32. Lewis cites little legal authority on this point, choosing instead to focus on the facts. According to her, Wilson docked another black applicant (Reginald Wright) when he reviewed his resume a second time— just as Wilson did with Lewis. *Id.* Wilson docked no other candidates, meaning the only scores he adjusted belonged to black applicants. *Id.* Yet it is undisputed Wilson did not know of Wright's race during the review process. *See* Def.'s Reply & Opp'n at 13; Pl.'s Reply at 17. So Lewis's claim that the Department engaged in a pattern of discrimination finds no footing in fact.

\*   \*   \*

Lewis's case lacks *any* proof of discrimination. Instead, her evidence supports an allegation of cronyism. And though cronyism is unseemly and concerning, it does not violate

Title VII.  *See Thompson v. McDonald*, 169 F. Supp. 3d 170, 185 (D.D.C. 2016) ("Title VII does not prevent employers from favoring employees because of personal relationships: if a protégé, an old friend, a close relative or a love interest gets special treatment, that special treatment is permissible as long as it is not based on an impermissible classification." (cleaned up)).  Title VII forbids *discrimination*.  And no reasonable jury could find that the Secretary denied Lewis a promotion because of her race or sex.

## IV.

Based on the undisputed facts and controlling law, the Secretary is entitled to summary judgment on Lewis's sole claim.  This conclusion is independently supported by consideration of the timing of Lewis's claim and its merits.  So the Secretary's motion must be granted, and Lewis's denied.  A corresponding order shall issue today.

Dated:  November 28, 2023                      TREVOR N. McFADDEN, U.S.D.J.